FILED
United States Court of Appeals
Tenth Circuit

**January 20, 2010**

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JESUS LOPEZ REYNA,

Defendant - Appellant.

No. 09-6043

(W.D. Oklahoma)

(D.C. No. 07-CR-00319-F-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **SEYMOUR**, and **ANDERSON**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Defendant and appellant Jesus Lopez Reyna pled guilty, pursuant to a plea agreement, to one count of conspiracy to possess with intent to distribute and to distribute assorted controlled substances, including fifty grams or more of actual

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

methamphetamine, five kilograms or more of a mixture or substance containing a detectable amount of cocaine, and multi-pound quantities of marijuana, all in violation of 21 U.S.C. § 846. Mr. Reyna was then sentenced to 300 months' imprisonment, followed by five years of supervised release. He was also ordered to pay a $100 special assessment and to forfeit certain assets. Despite the existence of an appellate waiver in the plea agreement, Mr. Reyna attempts to appeal his sentence. We enforce the appellate waiver and dismiss this appeal.

**BACKGROUND**

In November 2005, the Federal Bureau of Investigation ("FBI") and the Oklahoma City Police Department ("OCPD") began a joint investigation into the drug trafficking activities of the Walnut Gangster Crips gang in the Oklahoma City area and elsewhere. The leaders of the Crips gang were identified as Arther Draper and Marcus Gilkey, who ultimately cooperated with law enforcement in the investigation. Law enforcement officers found out that Mr. Gilkey was purchasing one to two kilograms of cocaine a week from a man named "Greg," later identified as Gregorio Reyna. One of Greg's suppliers was his uncle, appellant/defendant Mr. Reyna, who was allegedly supplying approximately four kilograms of cocaine per week, from January 2005 until July 2006. Law officers further determined that Mr. Reyna received cocaine, marijuana and

methamphetamine at his automotive detail and body shop, JR Detail, in Oklahoma City.

In April 2007, the OCPD used a confidential source ("CS") to begin making buys of methamphetamine from Mr. Reyna at JR Detail. Most of these transactions were set up by telephone calls between the CS and Mr. Reyna prior to the buy. On several occasions, Mr. Reyna used other individuals, such as co-conspirator Audencio Cardenas, to actually deliver the drugs to the CS and a second confidential source who also began making methamphetamine buys from Mr. Reyna in June 2007. A total of nine transactions took place between April 3, 2007, and August 30, 2007, involving sales of drugs by Mr. Reyna and his associates to the two confidential sources. During this same time period, Mr. Reyna had Mr. Cardenas pick up a pound of methamphetamine from another associate, Alfredo Cruz.

On October 3, 2007, physical surveillance at JR Detail saw an individual, later identified as Felipe Reyna (a co-conspirator and Mr. Reyna's brother) arrive at the auto shop and meet with Mr. Reyna. As he left the shop, Felipe's car was stopped pursuant to a traffic stop and law officers found one kilogram of cocaine in his car. Felipe cooperated with the investigation and told law enforcement personnel that between February 2006 and October 2007, he had acquired approximately twenty kilograms of cocaine from Mr. Reyna.

Following the traffic stop and seizure of cocaine from Felipe's car, law enforcement obtained a search warrant for JR Detail. In the Ford 250 truck owned and driven by Mr. Reyna, officers found a loaded Glock, model 30, .45 caliber semiautomatic pistol and three cell phones. In the west part of the shop, officers found two other pistols as well as various rounds of ammunition. They also found smaller amounts of cocaine in the shop.

Mr. Reyna was subsequently arrested. He stated that Anzel Betancourt was importing cocaine from Mexico and providing it to Alfredo Cruz and Francisco Trialla-Garcia, who in turn, passed it on to Mr. Reyna for distribution through Felipe, Greg and Selestino Reyna at the JR Detail shop. Mr. Reyna apparently indicated that between 2005 and July 2007, he distributed approximately 30 kilograms of cocaine that he had received from Mr. Betancourt.

Based upon additional interviews and further investigation, several other customers of Mr. Reyna's were identified. These included James Hall, a named co-conspirator who purchased a total of twenty pounds of marijuana from Mr. Reyna, and John Reed, who purchased approximately 300 pounds of marijuana from Mr. Reyna.[1] A number of individuals also provided information

_____

[1]Mr. Reed's testimony at the evidentiary hearing suggested that he had purchased between 136 and 480 pounds of marijuana from Mr. Reyna. The district court ultimately used the minimum amount of 136 pounds in calculating Mr. Reyna's base offense level.

as to Mr. Reyna's central role in the conspiracy, including his direction of others involved.

As indicated, Mr. Reyna was arrested, charged and ultimately pled guilty to a single count, pursuant to a plea agreement. The government specifically stated in the written plea agreement that it was "aware of more than 250 grams of actual methamphetamine, and between 15-50 kilograms of cocaine, . . . and multi-pound quantities of marijuana, applicable to [Mr. Reyna]." Plea Agreement at 8, Appellant's App. Vol. 1 at 95. The government also stated its belief that Mr. Reyna "should be assigned a leadership role in the offense, pursuant to [United States Sentencing Commission, Guidelines Manual ("USSG")] § 3B1.1." Id. at 9. Mr. Reyna reserved his right to contest drug quantities and the assessment of his role in the offense.

Both parties also specifically waived certain appellate rights. Mr. Reyna agreed not to:

> Appeal or collaterally challenge his guilty plea, sentence and restitution imposed, and any other aspect of his conviction, including but not limited to any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues;
>
> Appeal, collaterally challenge, or move to modify . . . his sentence as imposed by the Court and the manner in which the sentence is determined, provided the sentence is within or below the advisory guideline range determined by the Court to apply to this case.

Id. at 10-11.  Mr. Reyna specifically did not waive "the right to appeal a sentence above the advisory guideline range."  Id. at 11.

In preparation for sentencing, the United States Probation Office prepared a presentence report ("PSR").  The initial PSR indicated that Mr. Reyna's total offense level was 39, with a criminal history category of I, which yielded an advisory Guideline range of 262-327 months.

Mr. Reyna filed objections to the PSR, as well as a sentencing memorandum.  He argued that he should not be assigned a leader/organizer role, and he objected to the total drug quantity.  He further sought a downward departure or a variance.  The Probation Office addressed all of Mr. Reyna's objections, and revised its PSR twice.  The final PSR calculated that a total of 74,104.66 kilograms of marijuana equivalent should be attributed to Mr. Reyna for sentencing purposes.  PSR ¶ 53, Appellant's App. Vol. 1 at 132-33.  The PSR then determined Mr. Reyna's base offense level should be 38.  It recommended a 2-level increase for possession of dangerous weapons, a 4-level increase because Mr. Reyna was the leader/organizer, and a 3-level decrease for acceptance of responsibility, resulting in a total offense level of 41.  With a criminal history category of I, this yielded an advisory sentencing guideline range of 324 to 405 months.

Both Mr. Reyna and the government called witnesses during the evidentiary hearing on sentencing conducted on November 19 and 20, 2008.  There was

considerable testimony both as to the quantities of drugs involved and Mr. Reyna's role in the conspiracy. At the final hearing on sentencing, held on February 20, 2009, the district court addressed the remaining objections by Mr. Reyna. With respect to drug quantity, the court noted initially that Mr. Reyna had stipulated to nine drug transactions, which established a marijuana equivalent for sentencing purposes of 5,160.2 kilograms of marijuana. With respect to the disputed quantities, the court stated:

> I have reviewed every page of that 302-page transcript [of the earlier evidentiary hearing]. My findings are based on a preponderance of the evidence. As will be seen, I have resolved ambiguities as to the frequencies and numbers of transactions and with respect to quantities in favor of the defendant.
>
> I've got no doubt that the defendant is chargeable with substantial quantities of drugs in excess of those that I have found from the evidence, but my findings are based on that portion of the evidence before me which I find to be reasonably reliable and reasonably unambiguous. Testimony that was unacceptably vague, either in terms of dates or frequency of transactions or in terms of quantity, has been disregarded entirely.

Tr. of Final Sent. Proceedings at 13, Appellant's App. Vol. 1 at 512.

The court went on to make detailed and specific factual findings regarding the disputed quantities, and concluded that Mr. Reyna should be held accountable for 12,338 kilograms of marijuana equivalent. The court also concluded that an offense level increase was appropriate because of Mr. Reyna's leadership role:

> It was emphatically [Mr. Reyna's] criminal enterprise. He was the boss. He ran it. The others were subordinate to him. At a minimum, the following individuals participated in the operation of this

criminal drug distribution enterprise which was organized, led, and managed by the Defendant Jesus Reyna:  Felipe Reyna, Audencio Cardenas, Gregorio Reyna, Selestino Reyna, Anzel Betancourt, and Wedo.

. . . .

[Mr. Reyna] was both a leader and a manager of the criminal activity that was based at his detail shop. . . .  He commonly, if not in every case, set the price for the drugs that were distributed from his premises.  This was specifically confirmed by Felipe Reyna, among others, and reliably indicates the role of Jesus Reyna as the organizer and leader of this criminal activity.  If there was a question as to the weight of the drugs sold in any instance, that was resolved by Jesus Reyna.  On a number of occasions a sale transaction would be arranged on the telephone with Jesus Reyna, but someone else would actually make the delivery.

Typically, when another individual such as Audencio Cardenas or Felipe Reyna would make a delivery, they would return to the shop and dutifully turn in the proceeds of the sale to Jesus Reyna. This procedure was also confirmed by Felipe Reyna.  These men were not mere customers of Jesus Reyna, they were members of his organization.

Id. at 29-31.

The court accordingly concluded that the total offense level should be 39, with a criminal history category of I, resulting in an advisory Guideline range of 262 to 327 months.  The court also explicitly acknowledged Mr. Reyna's request for a downward departure or variance, acknowledged its authority to make such a departure, but concluded that "there is nothing in the Section 3553 factors which leads me to a conclusion . . . that a sentence below the bottom of the guideline range determined under the advisory guidelines is warranted."  Id. at 33.

-8-

The district court then sentenced Mr. Reyna to 300 months' imprisonment, stating,

> That sentence is sufficient but not greater than necessary to fulfill the objectives of sentencing under the Sentencing Reform Act.  In reaching that conclusion, I do take into account all the factors mandated by [18 U.S.C. § 3553], which I will not mention at length at this time.
>
> Mr. Reyna, this sentence of 25 years is the sentence that you clearly deserve.  You distributed an astonishing quantity of hard drugs in your years as a drug dealer.  In so doing, you have been instrumental in the devastation of countless lives and families.  And as I have said, I've seen no indication from you today or before today that you even thought about, much less cared about, the lives that you were devastating as a major dealer of hard drugs in this community.  You deserve every day of the 25-year sentence that the Court imposes upon you without parole.

Id. at 38.

Despite the existence of the appellate waiver in the plea agreement, Mr. Reyna endeavors to appeal his sentence, arguing (1) his waiver of appellate rights does not encompass claims alleging a violation of United States v. Booker, 543 U.S. 220 (2005); (2) Mr. Reyna was sentenced in violation of Booker; and (3) in refusing to depart downward, the district court committed both constitutional and non-constitutional Booker error.  We enforce the appellate waiver in this case and dismiss this appeal without reaching its merits.

**DISCUSSION**

"A defendant may not appeal [his] sentence if [he] has waived [his] appellate rights in an enforceable plea agreement." United States v. Smith, 500 F.3d 1206, 1210 (10th Cir. 2007). However, "[a] defendant's waiver of the right to appeal may itself be waived by the government." United States v. Contreras-Ramos, 457 F.3d 1144, 1145 (10th Cir. 2006). "The preferred procedure for invocation of an appeal waiver is for the government to file a motion under Tenth Circuit Rule 27.2(A)(1), or to argue the waiver issue in its brief." Id. In this case, the government has averred that it failed to file a motion to enforce the plea agreement, "[d]ue to an error on the part of counsel." Br. of Plaintiff-Appellee at 13, n13. But, the government argues the validity of the waiver in its brief, so we may proceed to consider whether to enforce the waiver.

"This Court employs a three-pronged analysis to determine whether to enforce a waiver of appellate rights." Smith, 500 F.3d at 1210 (citing United States v. Hahn, 359 F.3d 1315 (10th Cir. 2004) (en banc)). We examine "(1) whether the disputed appeal falls within the scope of the waiver of appellate rights; (2) whether the defendant knowingly and voluntarily waived his appellate rights; and (3) whether enforcing the waiver would result in a miscarriage of justice." Hahn, 359 F.3d at 1325. The plea agreement provided that Mr. Reyna waived the right to "[a]ppeal, collaterally challenge, . . . his sentence as imposed by the Court and the manner in which the sentence is determined, provided the

-10-

sentence is within or below the advisory guideline range determined by the Court to apply." Plea Agreement at 11, Appellant's App. Vol. 1 at 97. This waiver encompasses all appellate challenges to the sentence *and the manner in which it is calculated*, so long as the sentence is "within or below" the advisory Guideline range. The district court sentenced Mr. Reyna within the advisory Guideline range it calculated. Thus, Mr. Reyna's challenge to the manner in which the district court calculated his sentence (relying on facts to calculate drug quantities and his leadership role, allegedly in contravention of <u>Booker</u>) is precisely within the scope of the waiver.

Moreover, Mr. Reyna's argument that he did not waive the right to have the jury decide the facts supporting his sentence is meritless. "A sentencing court may find facts for sentencing purposes by a preponderance of the evidence." <u>Smith</u>, 500 F.3d at 1210. And, Mr. Reyna was told as much at the change of plea proceedings:

> THE COURT: Now, do you understand that as a result of your guilty plea, the facts that may have an effect on the severity of your sentence will be determined by me and not by a jury?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: By pleading guilty, you're giving up the right to have a jury determine one way or the other the facts which if proven to a jury beyond a reasonable doubt might have an effect on your sentence. Do you understand that?
>
> THE DEFENDANT: Yes, sir.

Tr. of Plea Proceedings at 12-13, Appellant's App. Vol. 1 at 179-80. Mr. Reyna's arguments fall squarely within the scope of the appellate waiver.

We now consider whether Mr. Reyna's waiver was knowing and voluntary. "The defendant bears the burden to demonstrate that [his] waiver was not knowing and voluntary." Smith, 500 F.3d at 1210. Under Hahn, we look primarily at two factors to determine the voluntariness of a particular defendant's waiver. We "examine whether the language of the plea agreement states that the defendant entered the plea agreement knowingly and voluntarily." Hahn, 359 F.3d at 1324. There can be no dispute that this condition has been met. We also "look for an adequate Federal Rule of Criminal Procedure 11 colloquy." Id. at 1325. The district court questioned Mr. Reyna extensively at the plea hearing, and clearly established that Mr. Reyna was competent to enter into the plea and understood its terms, including the waiver provisions.

Finally, we consider whether enforcing the waiver will result in a miscarriage of justice. "A miscarriage of justice occurs '[1] where the district court relied on an impermissible factor such as race, [2] where ineffective assistance of counsel in connection with the negotiation of the waiver renders the waiver invalid, [3] where the sentence exceeds the statutory maximum, or [4] where the waiver is otherwise unlawful.'" Smith, 500 F.3d at 1212 (quoting Hahn, 359 F.3d at 1327). There is no miscarriage of justice here.

In sum, because Mr. Reyna knowingly and voluntarily entered into the plea agreement containing a waiver of appellate rights, because the alleged errors are within the scope of the waiver, and because enforcement of the waiver would not result in a miscarriage of justice, we conclude that his plea agreement, and its appellate waiver, is enforceable. We therefore enforce the waiver and dismiss this appeal without further consideration.

## CONCLUSION

For the foregoing reasons, we DISMISS this appeal.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge